UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
STACY GUGLIELMO,

                     Plaintiff,

                                    MEMORANDUM
                                    & OPINION

      -against-

                                    02 CV 5434 (SLT)

MARCHON EYEWEAR, INC.,

                     Defendant.
-------------------------------------------------X
TOWNES, U.S.D.J.

      Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1968, the Equal

Pay Act of 1963, section 194 of the Labor Law of the State of New York and under New York State

Human Rights Law for discriminatory conduct she claims she suffered while in Defendant's

employ.  Defendant moves for summary judgment.  Based upon all submissions of the parties and

for the reasons stated below, Defendant's motion is granted in full, and the complaint is dismissed

in its entirety.

## I. *Facts and Procedural History*[1]

Plaintiff Stacy Guglielmo ("Plaintiff" or "Guglielmo") was employed by defendant Marchon Eyewear, Inc., ("Defendant" or "Marchon") as a royalty administrator from September 1998 (Pincus Decl. Ex. D ("Guglielmo Tr".) at 52) until August 29, 2001. Marchon is a manufacturer and distributor of eyewear for both its own brand labels and outside designers. (Def. 56.1 Stat. ¶ 3.) Plaintiff was hired at a salary of $35,000, though, by the time she left Marchon, her salary was $41,444. (Def. Stat. 56.1 ¶ 9, 15.) Plaintiff had experience in this field prior to her employment at Marchon, and also held both a General Equivalency Degree ("GED") and an Associate's Degree in Business Administration. (Def. 56.1 Stat. ¶ 57.)

In connection with Marchon's distribution of eyewear for outside designers, it is party to licensing agreements which allow Marchon to use licensor's names (such as Donna Karan or Calvin

---

[1] On any motion for summary judgment, the moving party is required, pursuant to Local Rule 56.1(a), to submit a Statement of Material Facts that it contends are not in dispute (hereinafter "Defendant's 56.1 Statement" or "Defendant's Statement"). The non-moving party then must, pursuant to Local Rule 56.1(b), set forth the material facts that it believes are in dispute, including a "***correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing*** a separate, short, concise statement of additional material facts as to which it is contended there is a genuine issue to be tried" (hereinafter "Plaintiff's 56.1 Statement" or "Plaintiff's Statement"). Local Rule 56.1(b) (emphasis in original). The rule further requires that "[e]ach statement ***by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact***, must be followed by citation to evidence which would be admissible." Local Rule 56.1(d) (emphasis in original). Defendant's statement contains 92 numbered paragraphs with citations to the record. Plaintiff disputes statements made in 56 of the 92 paragraphs, but offers a citation to the record supporting its version of the facts for only one of the 56 paragraphs. Indeed, many of Plaintiff's paragraphs disputing Defendant's paragraphs say only "Denies" or "Denies knowledge or information sufficient to form a belief as to the truth of the allegation." *See, e.g.*, Pl. 56.1 Stat. ¶¶ 40-50. In order to dispute the proffered facts, Plaintiff must do more than simply repeat the word "denies." As such, Plaintiff's attempt at controverting Defendant's 56.1 statement fails to comply with the Local Rules, and this Court will accept as true those statements made by Defendant for which Defendant has provided a citation to admissible evidence in the record.

Klein) on its products in exchange for fee, known as a royalty. (Def. 56.1 Stat. ¶ 5.) "Royalty reports" are prepared by Marchon quarterly and submitted to the licensor, detailing the fees to be paid to the licensor, and Marchon also prepares "advertising reports" for licensors, which detail the amount spent by Marchon to advertise a particular licensor's product. (Def. 56.1 Stat. ¶¶ 6-8.) As a member of the Royalty Administration department, Plaintiff's responsibilities at Marchon were thus intricately related to Marchon's agreements with its outside licensors. Guglielmo was primarily responsible for preparing royalty, advertising and sales reports. (Def. 56.1 Stat. ¶ 16.) Guglielmo performed sales forecasts, but not financial analysis. (Guglielmo Tr. at 99-100). As Guglielmo has no formal accounting training, Def. 56.1 Stat. ¶ 59, she had performed only "minimum accounting" in the past. (Def. 56.1 Stat. ¶ 62-65.) She did not prepare but did track media plans, Guglielmo Tr. at 104, did not do financial analysis, *id.* at 99, and didn't know how to perform basic accounting functions such as journal entries. (Guglielmo Tr. at 108; Def. 56.1 Stat. ¶¶ 16-17.) Indeed, it is undisputed that Plaintiff is not an accountant and was unaware of (and uninterested in learning) how to perform journal entries. (Def. 56.1 Stat. ¶ 18.) Upon hiring, Plaintiff was supervised by Mike Ferro. After the first few months of her employment, Michelle Curcio became her supervisor.

In July 2000, Marchon hired Richard Martin ("Martin") as its new Chief Operating Officer. (Def. 56.1 Stat. ¶ 19.) Martin was hired in furtherance of Marchon's effort to "re-engineer" the company, which process involved organizational restructuring to include a layer of staff whose function was to perform a greater, more sophisticated degree of informational analysis than that required by Marchon before. (Wenger Aff. Ex. 7 ("Gentile Tr.") at 42, 98; Gentile Aff. ¶¶ 18-20.) The position of Senior Accountant was born out of Marchon's decision to re-engineer the company and it was filled by Robert Squillace ("Squillace"). Squillace was hired on February 19, 2001. (Def. 56.1 Stat. ¶ 22.) He holds a Bachelor of Science degree in accounting, a Master's Degree in

Business Administration, and has had over 20 years of accounting and financial experience. (Def. 56.1 Stat. ¶ 68.) While Guglielmo was hired at a rate of $35,000 per year, Squillace's starting salary with Defendant was $65,000 per year, an amount he demanded of Marchon as commensurate with his prior salary as a senior financial manager at a music company. (Def. 56.1 Stat. ¶¶ 66-77; Squillace Aff. ¶¶ 8-10.) As of the filing date of this motion, November 2004, Squillace's salary was $70,339. (Def. 56.1 Stat. ¶ 77.)

Before Squillace was officially hired by Defendant, Plaintiff met with him to explain the responsibilities of the royalty group in general and her role within the group. (*Id.*; Guglielmo Tr. at 137-8.) Though it was Plaintiff's understanding at that time that Squillace would be performing the functions of her job while she was on maternity leave, *id.*, she did not know Squillace's official title when hired. (*Id.* at 132.)

Between February 19, 2001, and April 27, 2001, the date on which Plaintiff began her maternity leave, Plaintiff trained Squillace on preparation of royalty and advertising reports.[2] (Guglielmo Tr. at 148, 150.) Plaintiff claims the two also completed sales reports together. (*Id.* at 149.) Plaintiff also trained Squillace on an advertising program called the "AS400" (which involved providing him with project codes), oriented him to the ways Marchon generated reports, and instructed him on what was necessary to receive timely royalty payments. (*Id.* at 161-166.) Plaintiff admitted in her deposition that Squillace was already aware of how to do some of these tasks or would have been able to figure many of them out by referencing the various licensing agreements. (*Id.* at 162-164, 166-169.)

_____

[2] It is not clear whether advertising reports were part of Squillace's job duties. (Guglielmo Tr. at 152.)

*Dispute as to Squillace's Job Description*

Squillace estimates that 30-35% of his time at Marchon is spent performing analyses related to sales forecasts. (Def. 56.1 Stat. ¶29; Squillace Aff. ¶ 21.) These forecasts determine the percentage of sales of a particular licensor's product that Marchon must pay in royalties or spend in advertising. (Def. 56.1 Stat. ¶¶ 23-28; Squillace Aff. ¶¶ 17-21.) Miscalculated sales projections can significantly affect Marchon's profit margins. (Def. 56.1 Stat. ¶ 23-28; Squillace Aff. ¶¶ 17-21.) It is undisputed that Guglielmo did not perform the type of financial analysis necessary to create these sales forecasts. (Def. 56.1 Stat. ¶ 30; Squillace ¶ 22.) Additionally, Squillace participates in the preparation of "media plans" (which Plaintiff admits that she did not prepare), the decision of whether to change royalty rates, and reconciliation of accounts across different billing systems. He is involved with external audits, provides reports to management regarding the performance of Marchon's distributors, and provides financial analysis of technology licenses in preparation for meetings. (Def. 56.1 Stat. ¶ 31, 37, 39-44, 46-48.) Overall, the list of Squillace's undisputed job responsibilities that are in excess of Plaintiff's duties at Marchon is significant.

On the other hand, the Court finds Plaintiff's submissions on this motion troublesome, at best, and wholly disingenuous, at worst. In addition to the procedural deficiencies in Plaintiff's submissions are the many inconsistent allegations contained therein. As stated earlier, Plaintiff's 56.1 Statement, dated January 13, 2005, does not comply with the Local Rules and leaves the Court with no guidance in determining the bases – if any – for her objections to Defendant's Statement. *See*, *supra*, n.1. Alongside this insufficient 56.1 Statement is Plaintiff's Affidavit, also dated January 13, 2005, and her deposition testimony, both of which, at times, contradict both each other and the blanket and conclusory denials made in Plaintiff's 56.1 Statement, making Plaintiff's procedural shortcomings even more egregious.

For example, in paragraph 41 of Defendant's 56.1 Statement, it is alleged that Squillace performed certain tasks related to external audits. (Def. 56.1 Stat. ¶ 41.) Plaintiff's counterstatement "denies that he performed such duties while plaintiff was employed by Marchon." (Pl. 56.1 Stat. ¶ 41.) However, Plaintiff admitted in her deposition that she does not know the full scope of Squillace's duties either prior to or during her maternity leave. (Guglielmo Tr. at 176, 183.) Therefore, the Court cannot credit any of Plaintiff's attempts to dispute any duties performed by Squillace either before, during, or after her leave. *See also* Pincus Decl. Ex. A ("Guglielmo Aff.") ¶ 7 (denying Squillace determined royalty rates); Pl. 56.1 Stat. ¶ 28 (denying Squillace was responsible for recommending sales forecasts); Pl. 56.1 Stat. ¶ 37 (denying Squillace participated in review interpretation and analysis of licensing agreements and proposed royalty rates); Pl. 56.1 Stat. ¶ 39 (denying Squillace was responsible for performing reconciliations).

Defendant states that Squillace participated in the preparation of media plans. (Def. 56.1 Stat. ¶ 31.) Plaintiff's 56.1 Statement denied this, without any support in the record, stating only that Plaintiff "denies that [Squillace] performed such duties while plaintiff was employed by Marchon." Again, Plaintiff's admission that she could not speak to the scope of Squillace's duties precludes her denial that he performed this task. Additionally, and more troubling, Plaintiff stated in her deposition that she did not prepare media plans, admitted in her 56.1 Statement that she did not prepare media plans, denied in her 56.1 Statement that Squillace prepared media plans, stated in her affidavit that she trained Squillace on the preparation of media plans, and submitted an affidavit from Michelle Curcio, one of her former supervisors at Marchon, stating that Plaintiff did prepare media plans. *Compare* Guglielmo Aff. at ¶ 6, Guglielmo Tr. at 104, *and* Pincus Decl. Ex. B ("Curcio Aff.") at ¶ 7 *with* Pl. 56.1 Stat. ¶ 36.

Additionally, Plaintiff denied knowledge or information sufficient to form a belief as to paragraph 54 of Defendant's 56.1 Statement, which reads as follows:

> As a result of a medical condition, Mr. Squillace was required to take a six-week leave of absence while employed by Marchon. During that time, a senior manager, Joseph Podbielak, Senior Director of Financial Design and Brands, assumed the majority of my [*sic*] responsibilities.

(Def. 56.1 stat. ¶ 54 (*quoting* Squillace Aff. ¶ 34); Pl. 56.1 stat. ¶ 54 (denying knowledge of same).) However, in her affidavit, Plaintiff states that the preparation of advertising and media plans "*[l]ike Mr. Squillace states*...was performed 'in conjunction with the brand manager,'" quoting the very same information about which she claimed to have no knowledge. (Guglielmo Aff. ¶ 6 (*quoting* Squillace Aff. ¶ 34) (emphasis added).

Another example of Plaintiff denying then admitting knowledge of a particular fact involves the dispute over who performed what tasks in the creation of sales forecasts. *See* Squillace Aff. ¶ 20 (Squillace responsible for recommending sales forecasts); Def. 56.1 stat. ¶ 28 (same); Pl. 56.1 stat. ¶ 28 (denying that Squillace did same while Plaintiff was employed by Marchon); Pl. Aff. ¶5 ("*Just as Mr. Squillace described in his affidavit* (¶ 20), my job required me to...work[] closely with the brand managers in forecasting sales data.") (emphasis added). Needless to say, the inconsistencies in Plaintiff's submissions are staggering.

Where Plaintiff's rendition of her or Squillace's job duties *are* internally consistent, they still fail to controvert Defendant's rendition with admissible evidence. For example, Defendant claims Squillace performs a variety of tasks, referred to as "Special Projects," that were outside the scope of Plaintiff's duties. (Def. 56.1 Stat. ¶ 46-49.) Plaintiff's 56.1 Statement "denies knowledge or information sufficient to form a belief as to the truth of so much of [these paragraphs] as alleges Mr. Squillace's current duties." (Pl. 56.1 Stat. ¶ 46-48.) Here, Plaintiff admits her inability to

speak to Squillace's current duties, but cannot dispute that they were being performed by him when she worked there. Plaintiff's response, instead, was to state in her affidavit that she, too, performed "special projects," using the same term as Defendant but describing different duties than those Squillace alleged to have performed, and not purporting to establish that Guglielmo participated in Squillace's "Special Projects." Therefore, Plaintiff's "special projects" are a separate set of duties that do not appear to be related to those listed in Defendant's "Special Projects," and, interestingly, do not appear in the record prior to her affidavit. *See also* Def. 56.1 Stat. ¶ 50 (alleging Squillace attended meetings with senior management to present media plans and answer questions about sales forecasts); Pl. 56.1 stat. ¶ 50 (denying knowledge of same); Guglielmo Aff. ¶ 12 (claiming, without citation to the record, that plaintiff attended meetings with management but giving no indication of duties at meeting).

Further tainting Plaintiff's allegations is the affidavit submitted on her behalf by Michelle Curcio, who was employed by Defendant from September 1998 until May 2001, and who supervised Plaintiff from September 1998 until January 2001. *See* Curcio Aff. In it, Curcio claims that Plaintiff performed the same job functions of Squillace, but does so largely by parroting the language of Squillace's affidavit. *See*, *e.g.*, Squillace Aff. ¶ 15 ("I regularly provide financial analysis to assist the Brand Managers in generating sales forecasts."); Curcio Aff. ¶ 6 ("A large part of Ms. Guglielmo's job was assisting brand managers in generating sales forecasts."); *see also* Squillace Aff. ¶ 29 ("[B]etween audits, I ensure that all processes and procedures are sufficient to meet/exceed audit standards."); Curcio Aff. ¶ 11 ("Guglielmo ensured that all processes and procedures were sufficient to meet audit standards.").

Curcio also claims that Defendant did not create a new position of senior accountant for Squillace because she held the position of senior accountant from September 1998 until May 2001.

8

Curcio Aff. ¶¶ 2-4. However, Curcio, who is a plaintiff in a separate action against Defendant in this district, *Curcio v. Marchon Eyewear, Inc.*, 02-CV-4291 (E.D.N.Y. 2004) (Platt, J.), identified in that action that her positions at Marchon were "Supervisor of Financial Reporting," followed by "Manager of Financial Reporting," not senior accountant. *Curcio v. Marchon*, 02-CV-4291, docket at 1. Curcio's affidavit adds even more confusion in identifying Plaintiff's theory of the case.

In sum, it is clear that Plaintiff failed to properly controvert those statements establishing Squillace's job functions that were analyzed herein.

*Relationship between Plaintiff and Squillace*

Plaintiff alleges that approximately one month after Squillace began working for Defendant, she was told by Dan Katz ("Katz"), her then-supervisor[3] and Director of Financial Reporting at Marchon, to "discuss everything" with Squillace. (Guglielmo Tr. at 116, 180.) She also states that Squillace replaced her in certain meetings with Katz. (*Id.* at 117.) Additionally, Plaintiff claims that, prior to taking maternity leave, Katz told her "trust me, you won't want to work these house when you have a baby," and "I don't know why you work these hours. I know how much those recruiters make." Guglielmo Aff. ¶ 13. Plaintiff interpreted the latter comment to refer to her husband's job — presumably that Plaintiff does not need her salary. *Id.*

Two days prior to the commencement of Plaintiff's maternity leave, she complained to Mike Doris, Marchon's Corporate Controller, and Katz that she did not think it was fair that Squillace was made supervisor of the royalty/licensing department. (Def. 56.1 Stat. ¶ 78.) Plaintiff made no reference to discrimination or her gender during this meeting.

---

[3] In April 2001, Katz replaced Curcio as Plaintiff's supervisor. (Guglielmo Tr. 53.)

On April 27, 2001, Guglielmo left the office for maternity leave. (Def. 56.1 Stat. ¶ 12.) During her leave, she met again with Katz, who asked that she meet with Squillace for the purpose of discussing what she refers to as her "new job descriptions." (Guglielmo Tr. at 115, 153.) Plaintiff was informed that Squillace was promoted to manager of licensing and contracting and that, upon her return, she would be expected to work late at times. (Guglielmo Tr. at 184.) Plaintiff testified that she was told by Katz that the decision to promote Squillace was "based on resumes." (Guglielmo Tr. at 185.) Also at the meeting with Katz, Plaintiff requested a salary increase, which was denied.[4] (Guglielmo Tr. at 115, 184.)

Upon Guglielmo's return to Marchon, she experienced a reduction in duties. (Guglielmo Tr. at 188.) Plaintiff's duties with respect to advertising and with respect to the audit of a particular account were taken away. (Guglielmo Tr. at 111-2.) However, she could not say whether her advertising duties were transferred to Squillace. (Guglielmo Tr. at 152). Plaintiff also complains that she was no longer permitted to attend meetings with management.

*Plaintiff Gives Notice*

In August 2001, Plaintiff again complained to Robert Feldman, Vice President of Human Resources, that she did not think Squillace's promotion was fair. (Def. 56.1 Stat. ¶ 79.) Plaintiff did not mention the word "discrimination" or claim that she felt she was being unfairly treated on account of her gender. (Def. 56.1 Stat. ¶ 80.) In response thereto, Gentile, Marchon's Vice President of Finance, asked Plaintiff to define the role she wanted in the department. (Def. 56.1 Stat. ¶ 81.) Plaintiff stated that she did not want Squillace as a manager. (Def. 56.1 Stat. ¶ 82.)

---

[4] Plaintiff appears to have requested a raise on several occasions and claims that she was told that the matter could be addressed after her leave. (Guglielmo Tr. 112-114.)

Defendant claims Plaintiff was offered the opportunity to be supervisor of royalty administration, to no longer have to report to Squillace, and to receive a salary increase. (Def. 56.1 Stat. ¶ 83; Pl. 56.1 Stat. ¶ 81.) Plaintiff denies having been given these opportunities. (Pl. 56.1 Stat. ¶¶ 81, 83.)

On August 24, 2001, Plaintiff announced her resignation to Defendant, effective August 31, 2001, one week later. (Def. 56.1 Stat. ¶¶ 84-85.) Among the reasons she cited for her decision to resign were frustration at Squillace having a higher salary than her, that she trained Squillace yet he was promoted, that she was not fairly evaluated by Katz and that she was not given the opportunity to get the manager role to which she felt entitled. (Def. 56.1 Stat. ¶ 86.) Gentile asked Plaintiff to reconsider, and "come up with a list of things that he could try to do to rectify the situation." (Def. 56.1 Stat. ¶ 87 (*quoting* Guglielmo Tr. at 214).) Plaintiff returned the following week with a demand that she be paid the same as Squillace. (Def. 56.1 Stat. ¶ 89.) Her demand was turned down. (Def. 56.1 Stat. ¶ 90.)

On Wednesday, August 29, 2001, two days prior to the date Plaintiff designated as her last, Feldman called Plaintiff into his office and informed her that it would be her last day at Marchon. (Guglielmo Tr. 126-128.) Plaintiff testified that she asked Feldman and Gentile what she had done wrong and "they said it's just best for us right now, and that was it." (Guglielmo Tr. 231-2.) Plaintiff was offered a severance package which, she believes, included a release, and she refused to sign it. (*Id.*)

On October 9, 2002, Plaintiff filed the instant complaint, alleging several violations of state and federal law. Plaintiff claims that by failing to pay her a salary equal to Squillace's, Defendant violated The Equal Pay Act ("EPA"), § 194 of New York Labor Law, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e, *et seq.*, New York State Human Rights Law ("NYSHRL") and New York Executive Law §291 *et seq.* Plaintiff also claims that Marchon's

failure to promote her violates Title VII and NYSHRL, that Defendant retaliated against her by discharging her after she complained about Squillace, and that she was discharged because of her gender in violation of both Title VII and NYSHRL. Defendant moves for summary judgment, alleging Plaintiff has failed to show she and Squillace performed equal work, that she failed to show she was qualified for a promotion, and that she fails to make a prima facie showing of discrimination or retaliation.

II.    *Discussion*

Summary judgment is appropriate where "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c).  "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).  To be "genuine," an issue of fact must be supported by evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Holtz*, 258 F.3d at 62.   Because the moving party bears the burden of showing that there are no genuine issues of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), "a court must resolve all ambiguities and draw all reasonable inferences against [it]."  *Alston v. New York City Transit Authority*, 2003 U.S. Dist. LEXIS 21741, *4 (S.D.N.Y. 2003) (*quoting Matsushita Elec. Indus. Co. v.  Zenith Radio Corp.*, 475 U.S. 574 (1986)).

Discrimination claims are subject to the well-known burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under *McDonnell*, if plaintiff is able to establish a prima facie case of discrimination, the burden then shifts to the employer.  *Murphy v. Bd. of Ed. of the Rochester City Sch. Dist.*, 273 F. Supp. 2d 292, 301 (W.D.N.Y. 2003).  If the employer can show "a legitimate, clear, specific and non-discriminatory reason" for the adverse

action," the plaintiff assumes a new burden, that of showing that the employer's proffered reasons are a pretext and that "more likely than not employees membership in a protected class was the real reason for the adverse action." *Id.*

A.      *Equal Pay Act*

The Equal Pay Act ("EPA") "prohibits employers from discriminating among employees on the basis of sex by paying higher wages to employees of the opposite sex for 'equal work.'" *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999) (quoting 29 U.S.C. § 206(d)(1)).  To establish a prima facie case of gender discrimination under the EPA, a plaintiff must demonstrate that (1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions.  *See* 29 U.S.C. § 206(d)(1); *Ryduchowski v. Port Auth. of New York and New Jersey*, 203 F.3d 135, 142 (2d Cir. 2000); *Belfi*, 191 F.3d at 135.  Jobs which are "merely comparable" are insufficient to satisfy a plaintiff's prima facie burden and, importantly, a plaintiff need not establish that her employer acted with discriminatory intent.  *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995); *Ryduchowski*, 203 F.3d at 142.  Because this first factor is undisputed, it need not be addressed here.

1.      *Equal Work*

To show that the employees perform equal work on jobs requiring equal skill, effort, and responsibility, plaintiff need not demonstrate that her job is identical to a higher paid position, but only must show that the two positions are "substantially equal."  *See Lanvin-McEleney v. Marist College*, 239 F.3d 476, 480 (2d Cir. 2001).  This mitigation notwithstanding, the standard for what

constitutes "equal work" remains high. *See Heap v. County of Schenectady*, 214 F. Supp. 2d 263, 271 (N.D.N.Y. 2002); *Dinolfo v. Rochester Telephone Corp.*, 972 F. Supp. 718, 723 (W.D.N.Y. 1997). Jobs that are "merely comparable" do not meet this standard. *Lambert v. Genesee Hosp.*, 10 F.3d 46, 56 (2d Cir. 1993), *cert. denied*, 511 U.S. 1052; *Pfeiffer v. Lewis County*, 308 F. Supp. 2d 88, 99 (N.D.N.Y. 2004) (*quoting Lambert*); *Sobol v. Kidder Peabody*, 49 F. Supp. 2d 208, 219 (S.D.N.Y. 1999) (*quoting Lambert*). The criterion for comparison is "job content and not job title or description." *Tomka v. Seiler Corp.*, 66 F.3d at 1310; *see also* 29 C.F.R. § 1620.13(e) ("Application of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance.").

The standard for determining whether plaintiff's claim survives summary judgment on the "equal work" issue is whether, viewing the facts in the light most favorable to plaintiff, plaintiff has produced enough evidence such that a reasonable jury could find that the jobs were "substantially equal." *Hernandez v. Kellwood Co.*, 2003 WL 22309326 17862, at *9 (S.D.N.Y. Oct. 8, 2003). Summary judgment is not proper if Plaintiff has presented facts on which a reasonable jury could find that Plaintiff performed equal work to Squillace. *Aldrich v. Randolph School Dist.*, 963 F.2d 520, at 527.

Plaintiff argues that whether she has met her burden on this second element ("equal work") is automatically a jury question, citing *Lavin-McEleny*, 239 F.3d at 480 ("Whether two positions are 'substantially equivalent' is a question for the jury."), but this is not the case. *Lavin-McEleny* makes this conclusion based on a statement in *Tomka*, 66 F.3d at 1331, which left for the jury the question of whether the nature and scope of supervision provided by two managers during two different phases of an employees' training at a particular company were substantially different. *Id.* *Tomka* did not state that the trier of fact always decides whether two jobs are equal.

Plaintiff also cites *Graham v. Long Island Rail Road*, 230 F.3d 34, 39 (2d Cir. 2000), for the proposition that "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury." (Pl. Mem. of L. at 9.) Not only does the Second Circuit's use of "ordinarily" mean that the statement is not a rule, but the quotation is also taken from the portion of the *Graham* opinion devoted to the issue of whether the plaintiff made a prima facie showing of racially discriminatory animus under Title VII, and not at all dealing with the Equal Pay Act. *Id.* Curiously, Plaintiff also cites *Pfeiffer*, 308 F. Supp. 2d at 99, for the proposition that "[o]ften, whether two position are substantially equivalent for Equal Pay Act purposes is a question for the jury," though, in that case, the court found that the only reasonable conclusion from the evidence was that there *was* so a sharp divergence between the two jobs propounded by plaintiff to be equal that summary judgment was proper. *Id.* at 100. Therefore, it is not the law in this Circuit that the second element of must be determined by a trier of fact.

Accordingly, this Court finds that no reasonable juror faced with the record in this action could conclude that Plaintiff and Squillace performed equal work at Marchon. Though it is Plaintiff's burden to show that she and Squillace performed equal work, her submissions routinely deny knowledge or information sufficient to dispute Defendant's allegations as to Squillace's duties and, thus, fail to create a genuine issue of material fact. *See Aztar Corp. v. NY Entertainment, LLC*, 15 F. Supp. 2d 252, 254 n.1 (E.D.N.Y. 1998) (Glasser, J.) (defendants' statement "replete with responses of 'lack of knowledge or information sufficient to either admit or deny' [does not] create any issues of fact"). Rule 56 of the Federal Rules of Civil Procedure provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits...must set

> forth specific facts showing that there is a genuine issue for trial.  If the adverse
> party does not so respond, summary judgment, if appropriate, shall be entered
> against the adverse party.

Fed. R. Civ. P. 56(e).  It is therefore undisputed that Squillace and not Plaintiff provided sales forecasts at Marchon, participated in the preparation of media plans, participated in the analysis of proposed royalty rate changes, and performed "Special Projects" — including reporting to management regarding whether Defendant's distributors were in compliance with their distribution contracts and providing financial analysis regarding particular technologies — among many other responsibilities that Plaintiff did not allege she completed.   From 60 to 65% of Squillace's time is spent on sales forecasts and media plans alone, two tasks that Plaintiff admittedly does not perform.

As discussed, *supra*, to the extent Plaintiff disputes any of Squillace's duties, it is without citation to the record, or through the use of an affidavit prepared for the purpose of this motion that contradicts Plaintiff's prior deposition testimony and is, therefore, insufficient to create a genuine issue of material fact at this stage.   "It is well settled in this circuit that a party's affidavit which contradicts [her] own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987); *see also Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."); *Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would generally diminish the utility of summary judgment as a procedure for screening out sham issues of fact.").  That Plaintiff both failed to depose Squillace and admitted she remains unaware of the full scope of his job

responsibilities at any point prior to, during, or since her maternity leave are circumstances fatal to her claim that the two performed equal work. Because no reasonable jury could find that Plaintiff and Squillace performed equal work, her claims under the Equal Pay Act must fail. *Pfeiffer,* 308 F. Supp. 2d at 99 (summary judgment is proper if "the evidence in the record is such that no fair-minded trier of fact could reasonably conclude that the two positions are substantially equivalent").

B.      *Equal Pay under Title VII*

"A claim of unequal pay for equal work under Title VII and [NY]HRL is generally analyzed under the same standards used in an EPA claim...However, unlike an EPA plaintiff, a Title VII plaintiff must also produce evidence of discriminatory animus in order to make out a prima facie case of intentional sex-based salary discrimination." *Tomka*, 66 F.3d at 1312-3. Because Plaintiff failed to make out a prima facie showing under the EPA, she necessarily fails to make a prima facie showing for sex-based salary discrimination under Title VII or NYSHRL. Those claims, too, are hereby dismissed.

C.      *Failure to Promote under Title VII*

"To meet her initial burden of establishing a prima facie case of discrimination, [Plaintiff] must demonstrate that: (1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she suffered an adverse employment action; and (4) the circumstances surrounding that action permit an inference of discrimination." *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004) (*quoting McDonnell*, 411 U.S.

at 802).  Plaintiff has failed to meet this burden because, *inter alia*, she has failed to allege that she was qualified for Squillace's position at Marchon.

In order to survive summary judgment at this stage, Plaintiff must show that she met Defendant's criteria for the position.  *Id.* at 127.  Plaintiff has not offered any evidence that she was qualified for Squillace's position, and, again, because she cannot speak to the scope of Squillace's job duties at any point during his or her employment at Marchon, she cannot possibly allege that she is qualified for his job.[5]  *See Williams*, 368 F.3d at 129 (affirming dismissal of failure to promote claim where plaintiff failed to allege the she was qualified for position); *see also Dawson v. Bumble & Bumble*, 398 F. 3d 211, 224 (2d Cir. 2005) ("[Plaintiff's] merely subjective assessment of [her] chances for promotion does not create an issue of fact as to whether [Defendant's] failure to promote [her] was motivated by discriminatory intent.").[6]

---

[5] Indeed, it is noteworthy that Plaintiff attempted to distinguish a case cited by Defendant, *Breland-Starling v. Disney Publishing Worldwide,* 166 F. Supp. 2d 820 (S.D.N.Y, 2001), on the grounds that the plaintiff therein conceded that she did not know the responsibilities of the employee who received the promotion.  *See* Pl. Mem. of Law at 21 n.3.  Given that Guglielmo admits just that in this action, Plaintiff can state no further reason for this claim to survive.  It is perhaps for this reason that Plaintiff chose not to utilize analogous case law in her opposition to this portion of Defendant's motion.

[6] Some courts in this circuit evaluate failure to promote claims using a test slightly different from the one used in *Williams* and this opinion.  *See, e.g., Petrosino v. Bell Atlantic*, 385 F.3d 210, 226 (2004) (requiring plaintiff to demonstrate that "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications").  Having failed to show she was qualified for a promotion, Plaintiff would, in any event, fail the *Petrosino* test.

D.      *Retaliation*

Title VII provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees...because [such employee] has opposed any practice made an unlawful employment practice by this title, or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e-3(a) (citations omitted). Title VII is violated when "a retaliatory motive plays a part in adverse employment actions towards an employee, whether or not it was the sole cause." *Terry v. Ashcroft*, 336 F.3d 128, 140 (2d Cir. 2003) (quoting *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993)) (internal quotation marks omitted). The burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for discrimination claims applies as well to retaliation claims brought under this statute. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). In the context of a motion for summary judgment, a plaintiff must first demonstrate a prima facie case for retaliation by showing that she "engaged in protected activity, that the employer was aware of this activity, that the employer took adverse action against the plaintiff, and that a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action." *Sands v. Runyon*, 28 F.3d 1323, 1331 (2d Cir. 1994) (*quoting Sumner v. United States Postal Service*, 899 F.2d 203, 208-209 (2d Cir. 1990)). A plaintiff's burden in making out a prima facie case is "de minimis." *Richardson v. N.Y. State Dept. of Correctional Serv.*, 180 F.3d 426, 444 (2d Cir. 1999) (*quoting Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir. 1994)).

Once a plaintiff has established a prima facie case of retaliation, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. If a defendant meets this burden, 'the plaintiff must point to evidence that would be sufficient to

permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'" *Treglia*, 313 F.3d at 721 (*quoting Cifra v. General Electric*, 252 F.3d 205, 216 (2d Cir. 2001)).

In this case, each of the factors are in dispute.


1.      *Protected Activity*

"To prove that [s]he engaged in a protected activity, the plaintiff need not establish that the conduct [s]he opposed was in fact a violation of Title VII...The plaintiff must demonstrate a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 583, 593 (2d Cir. 1988). "Mere subjective good faith belief is insufficient, the belief must be reasonable and characterized by *objective* good faith." *Sullivan-Weaver v. New York Power Auth.*, 114 F. Supp. 2d 240, 243 (S.D.N.Y. 2000) (*citing Manoharan*) (emphasis in *Sullivan-Weaver*). "The reasonableness of the belief is to be assessed in light of the totality of the circumstances." *Galdieri-Ambrosini v. National Realty & Development Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). Though Guglielmo may have complained on several occasions that she believed Defendant was acting "unfair" in promoting Squillace, she admits that none of her complaints to Marchon's management mentioned discrimination on the basis of gender. (Guglielmo Tr. 192-4). This suggests that she did not have a good faith reasonable belief that the motivation behind Marchon's decision to promote Squillace was unlawful.

In *Manoharan*, plaintiff, a physician at Columbia's Harlem Hospital Center, objected to the hiring of a candidate on the grounds that the hospital was not following its affirmative action policy. *Manoharan*, 842 F.2d at 592. Plaintiff complained to the Vice Dean of the Faculty of

Medicine and was immediately discharged. The Second Circuit upheld the district court's finding that plaintiff did not prove a good faith, reasonable belief that the appointment of a white female constituted an unlawful practice. The court said:

> The fact that a white woman was chosen from a pool of candidates that includes several black individuals does not by itself indicate that Columbia's selection process was racially discriminatory. Even though Dr. Manoharan was aware that there were several minority applicants, and complained that they should be given greater consideration in the selection process, we agree with [the district judge] that appellant's objections *at the time* neither pointed out discrimination against particular individuals nor discriminatory practices by Columbia, *as they were alleged. The essence of appellant's complaints, at the time they were made, was that Columbia was not pursuing affirmative action goals in the selection process.* Since section 704(j) of Title VII states that affirmation action in employment practices is not required by Title VII...an employer's failure to follow its own voluntary affirmative action program cannot, by itself, constitute an unlawful employment practice...Therefore, *appellant's complaints about Columbia's selection process...were directed at something that, as it was alleged, is not properly within the definition of an 'unlawful employment practice.'*

*Id.* at 594 (emphases added); *see also Montanile v. National Broadcast Co.*, 211 F. Supp. 2d 481, 488 (S.D.N.Y. 2002) ("A simple dispute between an employer and an employee about the specific scope of an employee's duties is not related to protected activity under Title VII unless that dispute somehow touches upon the aims of Title VII."). It is undisputed that the essence of Plaintiff's complaints was that she felt treated "unfairly" and not that Defendant was in violation of the law.

However, Plaintiff testified that Katz told her "trust me, you won't want to work these hours when you have a baby," and "I don't know why you work these hours. I know how much those recruiters make."[7] Guglielmo Aff. ¶ 13. Giving these comments the weight due on a motion

---

[7] Plaintiff also alleges that Katz told Curcio, "Marchon is not a place for women with young children." (Guglielmo Tr. at 237.) Because Plaintiff heard this statement from Curcio, it is inadmissible. Although Katz's statements are not being offered for the truth of the matters asserted, Pincus' statement is, and Plaintiff has not identified any applicable hearsay exception. Accordingly, the statement cannot be considered here, as hearsay is inadmissible on a motion for

for summary judgment, *see Chambers,* 43 F.3d at 37, a reasonable juror could find there was a "semblance of gender-oriented motivation in the events or conversations" described by Plaintiff, *Galdieri-Ambrosini*, 136 F.3d at 292, and conclude that Plaintiff engaged in a protected activity. *See Chambers*, 43 F.3d at 36 ("The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment...The inferences to be drawn from the underlying facts revealed in materials such as affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion."). Therefore, for the purpose of this motion, Plaintiff has satisfied this element.

2.      *Employer's Knowledge of Protected Activity*

"[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII."  *Galdieri-Ambrosini*, 136 F.3d at 292. At a minimum, there must be "general corporate knowledge that the plaintiff has engaged in a protected activity."  *See Gordon v. New York City Board of Ed.*, 232 F.3d 111, 116 (2d Cir. 2000). That knowledge is lacking in this instance.  Plaintiff did not put Defendant on notice that her complaints were based on events she felt were discriminatory and, consequently, this element is not satisfied.

---

summary judgment. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by trial court in ruling on [a] motion for summary judgment"); *Fridman v. City of New York*, 183 F. Supp. 2d 642, 646 n.2 (S.D.N.Y. 2002) (granting summary judgment where plaintiff submitted newspaper articles and a City Council hearing transcript and the out-of-court speakers "were neither under oath nor making admissions against their interests"); *Corrigan v. New York Univ. Med. Ctr.*, 606 F. Supp. 345, 348 (S.D.N.Y. 1985) ("Hearsay...cannot be used under Rule 56(e) to stave off summary judgment.").  Curiously, Curcio does not mention the stricken Katz comment in her affidavit.

3.      *Adverse Employment Action*

Even if Plaintiff had informed Defendant that she believed she was a victim of illegal discrimination, her claim must nevertheless fail for want of a crucial element of a prima facie case of discrimination: an adverse employment action. Plaintiff has failed to put forward evidence that she was discharged. She tendered her resignation to Defendant on Friday August 24, 2001 and, though she indicated therein that Friday, August 31 would be her last day, under the circumstances of this case, she was not entitled by law to work a day beyond August 24, 2001.[8] *See*, *e.g.*, *Wynn v. Paragon Sys.*, 301 F. Supp. 2d 1343, 1354 (S.D. Ga. 2004) ("The customary two weeks notice period is a traditional courtesy the employee extends to the employer. Here [defendant] informed [plaintiff] that it did not need [her] to serve out this two week period."); *see also Leyva v. Computer Scis Corp.*, 2005 WL 196557, at *5 (D. Del. Jan. 25, 2005) ("An employer's decision to accept a resignation immediately, rather than accepting an employee's request that the resignation be effective at a future date, does not constitute an adverse employment action) (*quoting Wynn*).


E.      *Discriminatory Discharge*

In order to make out a prima facie case of discriminatory discharge, Plaintiff must show that "(1) [s]he belongs to a protected class; (2) that [s]he was performing [her] duties satisfactorily; (3) that she was discharged; and (4) that [her] discharge occurred in circumstances giving rise to an inference of discrimination on the basis of [her] membership in that class." *Chambers v. TRM*

---

[8] It is noteworthy that Plaintiff offers no case law in support of her argument that she was entitled to remain at Marchon until August 31. Instead, she argues for the first time that she was constructively discharged, citing one case from the Fifth Circuit and failing to refer to the prima facie elements of constructive discharge. (Pl. Mem. of Law at 23.) If Plaintiff does not deem this allegation worthy of further elaboration, neither does this Court, as there has been no evidence presented in support of that claim.

*Copy Ctrs. Corp.,* 43 F.3d at 37.   As discussed, *supra*, *at* (II)(D)(3), Plaintiff has not alleged an

adverse employment action.  Her failure to do so also requires the Court's dismissal of her

discriminatory discharge claim.[9]

III.    *Conclusion*

Plaintiff's submissions to this Court contain countless inconsistencies — all indicating that

she has failed to prosecute this action with enough zeal to put forward a cogent theory of the events

leading to her resignation.  Having no knowledge of the scope of Squillace's duties at Marchon

either before, during, or after her maternity leave, Plaintiff's allegation that the two performed

---

[9] Additionally, it is difficult to see how Plaintiff would meet the second element (*i.e.*, that she performed her duties satisfactorily) when she testified in her deposition that, when she thought certain responsibilities were Squillace's, she refused to carry them out:

| | |
|---|---|
| Counsel: | And [Squillace] asked you to complete the advertising reports? |
| [...] | |
| Counsel: | Did you do them? |
| Plaintiff: | No. |
| Counsel: | Why not? |
| Plaintiff: | I went to Bob Gentile and told him that it was not part of my job responsibilities anymore. |
| [...] | |
| Counsel: | As decreed by whom? |
| Plaintiff: | Bob Squillace. |
| Counsel: | But here Bob Squillace is asking you to do them, so if he's the one who determines what your duties are, why wouldn't you do them? |
| Plaintiff: | I didn't think it was right. |

(Guglielmo Tr. at 199-200).  Plaintiff also testified that "mentally, [she] was not focused into doing [her] job anymore" and "didn't love it anymore because [she] didn't love the circumstances in which [she] was working."  (Guglielmo Tr. at 233.)  Though this Court does not (and need not) make a finding as to the sufficiency of Plaintiff's job performance, it does not appear likely that Plaintiff was satisfactorily performing her job duties.

equal work is one that no reasonable juror could find meritorious. As such, Plaintiff's claims of unequal pay for equal work under both the EPA and Title VII must fail. Plaintiff's inability to speak to Squillace's duties also precludes her argument that she is qualified for his position, which, in turn, precludes her from meeting her prima facie burden on her discriminatory failure to promote claim. That, too, must be dismissed. Plaintiff's retaliation claim also fails, as there is no indication that Defendant was aware of her participation in a protected activity. Furthermore, Defendant's decision to make August 29 Plaintiff's last day at Marchon, rather than the day she requested, August 31, 2005, does not constitute an adverse employment in this case, providing additional grounds for dismissal of her failure to promote, retaliation and discriminatory discharge claims. In the absence of any remaining federal claims, Plaintiff's state law claims are also dismissed.[10]

        SO ORDERED.


Dated:        February 15, 2006
                Brooklyn, NY


                          _____S/_____
                          SANDRA L. TOWNES
                          UNITED STATES DISTRICT JUDGE

---

[10] Title 28 U.S.C. § 1367(c)(3) "permits a district court in its discretion, to decline to exercise supplemental jurisdiction over state law claims if it has dismissed all federal claims." *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 103 (2d Cir. 1988).